IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **Chris Martin**<br><br>Plaintiff,<br><br>v.<br><br>**Cleveland City Council President Blaine Griffin**, *et al.*,<br><br>Defendants. | Case No: 1:23-CV-2312<br><br>Judge Charles Esque Fleming |

**DECLARATION OF SUBODH CHANDRA REGARDING REASONABLENESS OF PLAINTIFF CHRIS MARTIN'S ATTORNEY FEES-AND-COSTS PETITIONS**

I, Subodh Chandra, respectfully declare as follows:

1.      I present this declaration to opine on

    a.  the reasonableness of the hourly rates submitted by Plaintiff's counsel in this captioned matter,
    b.  the reasonableness of the number of hours Plaintiff's counsel expended in this matter; and
    c.  the reasonableness of expenses incurred in these this captioned matter.

2.      To arrive at my opinions, I reviewed the line-item charges for fees; résumés of counsel; hourly rates; hours expended by task; costs; docket; complaint; the parties' court filings and stipulation regarding temporary-restraining order; court filings regarding preliminary injunction, court papers regarding the offer of judgment; the declaration of Professor Andrew Geronimo; and the motion for attorney fees.

3.      As explained in greater detail below, after this review, I find fair and reasonable the overall charges for attorney fees of approximately $113,000 by Case Western Reserve University's First Amendment Clinic and for expenses of $405.

4.      I understand that Plaintiff is requesting fee compensation at these current hourly rates (current rates being legally appropriate to request in fee-shifting litigation to account for the delay in payment):

    •  Andrew Geronimo, 2010 admittee, $475

PLAINTIFF'S EXHIBIT

**2**

- Sara Coulter, 2017 admittee, $300.
- Siobhan Gerber, 2021 admittee, $250.
- Certified legal practitioners (law students), $200

5.　For the reasons stated below, I find these hourly rates to not only be eminently reasonable but, as to the *lawyers, to be substantially lower than market rates.*

## BACKGROUND AND QUALIFICATIONS

6.　I am the founding and managing partner of the boutique firm The Chandra Law Firm LLC, The Chandra Law Building, 1265 W. 6ᵗʰ Street, Suite 400, in Cleveland, Ohio. Among our principal practice areas are complex civil-rights (including substantial First Amendment work), employment, and civil litigation. Although we are primarily focused on plaintiffs' litigation work now, we also do some defense work and strategic counseling in our practice areas. We do our work both on a fee-shifting basis and for hourly fee-paying clients, charging the same rates for all types of matters.

7.　Our law-firm website, www.ChandraLaw.com, includes information on some of the cases I have litigated. My résumé is attached as **Exhibit 1**.

8.　I have developed substantial experience in fee-shifting issues, and I have served as a fee expert or consultant in many other matters. For example, the U.S. District Court for the Southern District of Ohio (Sargus, J.) relied upon my expert testimony regarding attorney fees in reaching its fee decision in *Cmty. Refugee & Immigration Servs. v. Registrar, Ohio Bureau of Motor Vehicles*, Case No. 2:18-cv-1189 (S.D. Ohio Jun. 26, 2020).

9.　I graduated from the Yale Law School in 1994, where I was the executive editor of the *Yale Law & Policy Review*. I was privileged to study under civil-rights scholars like former U.S. Assistant Attorney General for Civil Rights and now-former Solicitor General Drew S. Days, III; now-former Department of State Legal Adviser and Assistant Secretary of State for Human Rights Harold H. Koh; and now-former Deputy Assistant Attorney General for Civil Rights Pamela Karlan. I was first admitted to the bar in 1995, in New Mexico (now inactive). I am also admitted in California and in Ohio. I practice in the U.S. District Courts for the Northern and Southern Districts of Ohio. I am also admitted and have practiced in various other federal courts across the United States, including the Northern District of Illinois, Third Circuit, Fourth Circuit, Sixth Circuit, and U.S. Supreme Court.

10.　Immediately after law school, I served a stint as special presidential counsel to the president-elect of the American Bar Association.

11.　After that, I worked in private practice in New Mexico assisting a nationally prominent civil-rights firm on plaintiffs' civil-rights matters.

12.　I then moved to Los Angeles, where I was a litigator with the large firm Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro. There, besides practicing entertainment litigation, I helped defend Los Angeles and Beverly Hills mayors, city-council members, police commissioners and other officials in high-profile, complex, civil-rights, section 1983 cases.

13.  I moved to Cleveland in 1997 to serve as a large-firm civil litigator, with what was then known as Thompson Hine & Flory, where I defended civil-rights matters, handled a high-profile plaintiff's civil-rights case on a *pro bono* basis, and worked on business-litigation matters.

14.  I then served as an Assistant U.S. Attorney, prosecuting complex economic-crime schemes. There, I won a commendation from then-FBI director Robert Mueller for "demonstrated excellence" in federal prosecutions, and a commendation from the special agent in charge of the FBI's Cleveland office.

15.  In 2002, I returned to a heavy civil-rights-related practice as law director and prosecuting attorney for the City of Cleveland. There I supervised a team of 85 lawyers, and the litigation, trials, appeals, and settlements of countless matters, including numerous civil-rights lawsuits. I personally edited all case-dispositive motions and appellate briefs.

16.  As examples of my personal docket, I represented Cleveland's mayor in the successful civil-rights defense in *Raycom Nat. Inc. v. Campbell*, 361 F. Supp.2d 679 (N.D. Ohio 2004); defended the City in a U.S. Department of Justice Civil Rights Division investigation into police use of force (ultimately negotiating a consent decree resolving the matter), and represented police supervisors in the successful district-court First Amendment defense of *African American Supervisor Ass'n v. Handke*, No. 1:03-cv-2077 (N.D. Ohio).

17.  I conducted many of the City's most complex settlement negotiations, including in several fee-shifting matters. Such negotiations included the subject of attorney fees and expenses.

18.  My civil-rights-defense work in Los Angeles and Cleveland taught me what it takes for lawyers—both plaintiffs' and defense—to litigate plaintiffs' fee-shifting cases at a high-quality level. As a defense lawyer, I came to respect a select few plaintiffs' lawyers who knew how to litigate the cases rigorously and thoroughly, doing the work to maximize value for the client, rather than doing the bare minimum to eke out a paltry settlement. I particularly came to respect those lawyers who selected and litigated their cases embracing the expectation of going to trial, and even appeal, despite the severe economic challenges that would result should those things happen.

19.  I returned to private practice, founding my firm in 2005. Also in 2005, I served as Distinguished Practitioner in Residence and full Adjunct Professor of Law at Case Western Reserve School of Law, teaching both legal ethics and appellate practice.

20.  I have for about 15 years served as the Ohio chapter president of the International Network of Boutique and Independent Law Firms (INBLF), an international network of law firms with highly credentialed attorneys comparable to those in large, international law firms.

21.  For about 10 years, I have served as a member of the Ohio Advisory Committee to the U.S. Commission on Civil Rights. I am currently serve as co-vice-chair of that Committee.

22.  I am also an active member of both the Ohio Employment Lawyers Association and the Cleveland Employment Lawyers Association.

23. My firm and I have successfully litigated some of the leading, recent fee-shifting decisions in the Sixth Circuit and Ohio appeals courts. These decisions include *Northeast Ohio Coalition for the Homeless v. Husted*, 831 F.3d 686 (6th Cir. 2016) (abrogating longstanding "*Coulter*" cap on attorney fees for time expended litigating over fees and upholding the district court's rejection of OSBA Economics of Law Practice survey as limit on rates because it under-reflects rates); *Lavin v. Husted*, 764 F.3d 646 (6th Cir. 2014) (reversing district court's fees decision on abuse-of-discretion standard and ordering reassignment to different district-court judge); *Cruz v. English Nanny & Governess School Inc.*, 2017-Ohio-4176, 92 N.E.3d 143, ¶ 105 (8th Dist.) (reversing trial court for abuse of discretion because fee award shocked the conscience by not fully considering the effort required to fully bring the case through litigation and for deviating from the lodestar calculation).

24. I have also written, consulted, developed, and taught continuing-legal-education courses, and served as an expert witness on attorneys' fees, legal-ethics, and professionalism issues. I authored *Charging Attorneys' Fees: Where Should the Line Be Drawn? A Plaintiff Lawyer's Perspective*, THE FEDERAL LAWYER (Jun. 2013). A copy is attached as **Exhibit 2.** It succinctly lays out the economic plight of the fee-shifting practitioner.

25. Based upon my experience litigating federal fee-shifting cases in Ohio and beyond, and my experience as a managing partner and former law director, and the time I invest studying the attorney-fee-rates market, I am highly familiar with the prevailing, customary market rates federal fee-shifting lawyers in Ohio and Northeast Ohio charge for their services, including hourly rates charged for legal services vindicating and protecting constitutional, First Amendment, employment, and statutory civil rights.

**MATTERS AND MATERIALS REVIEWED AND CONCLUSIONS REACHED REGARDING THE PROPOSED HOURLY RATES AND TIME SUBMITTED**

*Hourly rates*

26. Since 2008, I have continuously surveyed Ohio fee-shifting practitioners about their rates. I undertook a comprehensive study in 2013, and have regularly monitored and updated that information, including as recently as 2024.

27. I have considered Ohio Rule of Professional Conduct 1.5 and believe that the rates and fees sought here are consistent with the factors in the Rule, in particular

    a. the time and labor required;

    b. the novelty and difficulty of the questions involved, which were significant, especially given the cutting-edge nature of the First Amendment substantive-legal and equitable-relief issues involved, and the challenges Defendant imposed—including meritless opposition and briefing;

    c. the skill requisite to perform the legal service properly, which was high, given the novel issues;

    d.   the results obtained for the client (and others including the public), which was the temporary restraining order obtained—tantamount to a preliminary injunction given its indefinite time period, and that ultimately led to abandonment of an unconstitutional policy, and the judgment, which was not nominal given the difficulty of quantifying damages in a case like this;

    e.   the likelihood that the work will preclude other work by the attorneys, which here meant time spent on this matter was *not* spent on other matters;

    f.   the time limitations imposed by the client or by the circumstances, which was significant given the urgent need for relief from First Amendment violations and the Court's schedule;

    g.   the nature and length of the professional relationship with the clients, which here lasted the entire course of the litigation;

    h.   the experience, reputation, and ability of the lawyers performing the services (which is strong as to the lawyers, who were also guiding law students who did exemplary work).

28.    Having analyzed the fee declaration of Plaintiff's counsel; the motion for attorney fees; the relevant billing details; the docket; the complaint; the parties' court filings and stipulation regarding temporary-restraining order; court filings regarding preliminary injunction, court papers regarding the offer of judgment, I am familiar with the issues in the captioned case.

29.    I have reviewed the results obtained and the rates sought, as outlined in Professor Geronimo's declaration and the accompanying filings. Based on my experience and knowledge in fee shifting in this district of market rates, and applying the Prof.Cond.R. 1.5(a) factors, to a reasonable degree of professional certainty, the rates sought are not only reasonable, they are below market for the work performed.

30.    I am familiar with Plaintiff's counsel's experience and credentials. I have reviewed Professor Geronimo's declaration and counsel's résumés. Their experience and reputations are excellent—first rate. Their focus on First Amendment practice provides them with special experience before this Court.

31.    Also, Plaintiff's counsel's rates are substantially less than what own firm charges for services in similarly complex matters:

    a.   My own current Ohio hourly billing rate with *both fee-paying* and fee-shifting clients in civil-rights matters (including First Amendment matters) is **$600**. Following a hearing, the U.S. District for the Southern District of Ohio in 2019 approved an earlier rate of $500 hourly in *Obeidallah v. Anglin*, S.D. Ohio Case No. 2:17-cv-00720 for work performed 2017–19. (In between, my Ohio rate was $525, $550, $575, and $595. The current $600/hour rate is what I am charging for my time here.)

     b.   My partner Donald P. Screen, class-of-1990 admittee, also charges **$600** per hour.

     c.   And, for the other lawyers working with us, we charge rates ranging between **$325** (for newer lawyers) and **$450** (for more experienced lawyers).

     d.   We also charge hourly rates of **$200** for both paralegals and law clerks.

32.    High inflation over the last three years, higher overhead costs, experience, and high demand for our legal services—especially in the high-demand/low-supply civil-rights sphere—has resulted in increased hourly rates.

33.    Our many, hourly fee-paying clients in similar matters across Ohio pay us these rates, and we have settled numerous cases based on these calculations. These rates are lower than what the market will bear, but we have maintained them to provide potential clients of more modest means with access to our services.

34.    Since 2008, I have continuously canvassed Ohio civil-rights practitioners about their rates and maintained familiarity with court-approved rates for attorneys practicing in fee-shifting litigation. I regularly monitor such information and have continued to do so into this year.

35.    The rates we seek here are consistent with the market rates other comparable fee-shifting practitioners charge in complex litigation, and to their own fee-paying clients:

- Avery Friedman, admitted to practice in 1973, was approved for an hourly rate of **$795.68**, *Barrow v. City of Cleveland*, No. 1:16-cv-923, 2018 WL 3105110 (N.D. Ohio June 25, 2018), **$772.50** in 2017 and **$750** in 2016, *Lofton v. Hinton*, No. 1:15-cv-486, 2015 WL 4496214 (N.D. Ohio Mar. 23, 2016) (Doc. 34), at 2, 4 (Nugent, J.). Seventeen years ago, the Northern District of Ohio approved Mr. Friedman at **$500** hourly. *Southern Christian Leadership Conference, et al. v. McDonald*, No. 1:07-cv-3751, at 7 (N.D. Ohio Dec. 10, 2007) (O'Malley, J., approving $500 hourly rate for Avery Friedman).

- Eric Zagrans (Cleveland), a 1977 graduate and managing partner of Zagrans Law Firm LLC, in 2019 had an hourly rate of **$650**.

- W. Craig Bashein (Cleveland), a 1986 admittee and president of Bashein & Bashein Co., L.P.A., currently has hourly rates ranging from **$800 to $1,000**.

- Andrew Margolius (Cleveland), a 1983 admittee and partner in Margolius & Margolius, in 2022–23 had an hourly rate of **$550**.

- Donald J. McTigue (Columbus), a 1979 graduate and managing partner at McTigue & Colombo, in 2014 had an hourly rate of **$550** for himself, and **$360** for Mark McGinnis, a 2003 graduate. In 2018, the Supreme Court of Ohio approved Mr. McTigue's **$550** hourly rate in *State ex rel. Harris v. Rubino*, 2018-Ohio-5109, ¶ 11.

- Joel Levin (Cleveland), a 1976 graduate, in 2017 was charging an hourly rate of **$500**.

- Fred Gittes (Columbus), a 1975 graduate, in 2020 charged an hourly rate of **$500**.

- Anthony Lazzaro (Cleveland), a 2004 admittee, was awarded an hourly rate of **$500** in *Truex v. Drivers Direct, LLC*, 583 F.Supp.3d 1033, 1036 (N.D. Ohio 2022; Calabrese, J.).

- David Mills (Cleveland), a 2002 graduate, in 2019 had an hourly rate of **$500**.

- Christopher P. Thorman, a 1991 admittee with Thorman Petrov in 2024 charges an hourly rate of **$650**.

- Daniel Petrov, a 2001 admittee with Thorman Petrov in 2024 charges an hourly rate of **$600**.

- **Mark Griffin, a 1994 admittee formerly with Thorman Petrov Griffin and currently Cleveland's law director, in about *2015* charged a $500 hourly rate and, based on his former colleagues' rates, would be expected to charge at least $600–$650 now.**

- Amy Glesius (Cleveland), a 1996 graduate and named partner at Bolek Besser & Glesius LLC in 2014 had an hourly rate of **$450**.

- Aparesh Paul (formerly of Cleveland), a 2002 graduate, in 2017 had an hourly rate of **$400**.

- Matthew Besser (Cleveland), a 2004 graduate and like Ms. Bolek a named partner at Bolek Besser & Glesius LLC in 2019 had an hourly rate of **$400**.

36. As for our paralegal and law-clerk hourly rate of **$200**, I have canvassed other Northeast Ohio law firms and caselaw over 19 years and have consistently learned of rates ranging from **$175** to **$225**.

37. Based upon the above information, and the information provided in the declarations of Plaintiff's counsel about the attorneys' backgrounds and significant experience in First Amendment, civil-rights litigation, it is my opinion, to a reasonable degree of professional certainty, that the requested rates in this matter are not only fair and reasonable but low— well below market.

38. Based on the data above and their credentials and experience, Professor Geronimo could easily charge a $500–$550 hourly rate, Sara Coulter could charge $350–$425, and Siobhan Gerber could charge $325–$350.

39. Defendants are getting a bargain.

### Why the Court should support true market rates

40. Several key factual realities make it crucial that rates for practitioners of fee-shifting work be comparable to those that highly skilled practitioners could earn in other similarly complex fields such as anti-trust, complex business litigation, etc. Otherwise, top-quality lawyers will not have the incentives to accept and handle these risky assignments—Congress's main policy objective in enacting fee-shifting statutes. This is especially true for the work that Plaintiff's counsel do, which attracts so few, top-notch lawyers. Indeed, it is my perception

that because federal courts have been insufficiently supportive of civil-rights fee-shifting practitioners' lodestar fees in settlement negotiations, fewer lawyers are being attracted to this work.

41.   Attorneys handling fee-shifting cases, unlike those receiving fees from clients based on standard hourly rates, sometimes litigate for years without payment.

42.   Cases involving deferred payment create a serious "cash crunch" within such firms and public-interest organizations, where they must continue to fund from prior revenue overhead, labor, case expenses on other fee-shifting/contingency cases, etc.—and sometimes must incur and repay debt to keep operating and fulfilling solemn professional obligations to existing clients.

43.   That is, fee-shifting practices go through short periods of "feast" and long periods of "famine." Our firm has been in that position. Litigating for years without payment puts upward pressure on rates.

44.   And unlike firms who by-and-large are paid monthly based on hourly rates, firms and organizations doing fee-shifting work advance substantial costs for their clients without a guarantee of reimbursement.

45.   And as I noted above when discussing my experience and assessment of quality lawyering, the best fee-shifting lawyers understand the importance of investing time and expenses in their cases—just as they do for fee-paying clients. In my experience doing both defense and plaintiffs' work, firms charging lower rates sharply cut corners on both the hard work required and the expenses they should undertake. That is terrible for clients and terrible for civil-rights protection.

46.   As someone who has worked in large law firms (and served as general counsel of a billion-dollar-plus municipal corporation), I strive to practice at a high level of excellence without compromise. I would not find it professional to practice at anything less than that level of rigor. Falling short of that would compromise on competence, and would risk loss, under-recovery, or loss of available remedies like equitable relief, under a contingency or fee-shifting arrangement.

47.   Based on the success achieved in this case, it is evident Plaintiff's counsel and their law-clerk team shared that philosophy regarding this matter. The lawyers understand that they must exercise good judgment, they must not cut corners or clients' representations and interests will be compromised. This means that law firms that do fee-shifting work must recover their fees toward the top of the market to be in a financial position to continue fee-shifting work at a top-quality level. Otherwise, such law firms would do their clients, the courts, and the public a considerable disservice—and the quality of their work and their reputations would be compromised.

48.   In fee-shifting cases, plaintiffs' counsel have to spend even more time initially screening and investigating a case given the personal financial risk they bear. Counsel generally have spent significant time and incurred significant fees long before defense counsel learn a case exists. Vigorous screening and pre-suit investigation prevents the filing of frivolous claims,

counterclaims, and cross-claims—and courts and administrative bodies should encourage and reward it.

49.     Some parties in fee-shifting cases often face more significant discovery hurdles. For example, a defendant may not need much discovery other than a plaintiff's deposition. Plaintiffs in fee-shifting cases, by contrast, usually have fewer documents than the entities they are up against. If a party's production is modest, then opposing counsel need not spend as much time reviewing it or preparing for depositions considering it. The counsel in that same case may have to first fight vigorously for, and then wade through, thousands or more pages of documents produced by an opposing party or third parties, increasing fees.

50.     Given the above challenges, counsel in fee-shifting cases—who can only earn a living by spreading risk—have a *built-in incentive to minimize costs and time expended generally*. In my experience, all will try to do so, but only the good ones will nevertheless embrace the greater risk of doing the good, long, and hard work required to *win*.

51.     A court exercising its discretion over a fee petition should carefully consider that parties using the fee-shifting opportunity available to them deserve high-quality representation. As the caselaw provides, fact finders should avoid second-guessing the professional judgment of attorneys who do this work about what was required to win.

52.     The bottom line is that the Court should not trim Plaintiff's counsel's rates, effectively requiring Plaintiff's counsel to subsidize their participation in this litigation and service to the justice system—and depriving Plaintiff of the entitlement of fee shifting to the prevailing *party* under 42 U.S.C. § 1988. Doing so would cause any firm to have pause about its future participation in and allocation of substantial resources to such litigation. (Judicial hostility to fee shifting has given our firm such pause and caused us to reduce our percentage of fee-shifting civil-rights work and increase our hourly work at our standard rates.) And were it to undercut counsel's rates, the Court would interfere with the market for legal services.

53.     One of the collateral consequences of such interference would be that the Court would undercut the ability of Plaintiffs' counsel to state their standard rates—and that they are supported by judicial order—in seeking to persuade potential defendants to resolve disputes early. We do that all the time in fee-shifting cases, citing court orders and standard rates, and it often encourages early settlement, saving the judicial system a great deal of resources.

54.     Fee-shifting exists to encourage practitioners to do the same quality of work for those who cannot afford fees as they would for fee-paying clients—and to ensure and safeguard the protection of precious constitutional rights.

### *Hours invested and work performed to achieve success*

55.     Having reviewed the line-item billing, and the total hours submitted, I observe that the overall bill in this case is well *below* the range of bills our firm and others would have generated for similar work. That is a testament to Plaintiff's counsel's remarkable expertise and efficiency.

56.     In hard-fought proceedings like this, we would rarely have finished these proceedings up to this point—particularly having to engage in preliminary litigation regarding entitlement to

fees and other matters collateral to the merits—without having generated billing of *at least* $200,000.

57. *The fees incurred depend in large part on the behavior of opposing counsel and parties*—who should not then be heard to protest when they must pay the bills that result *from their own tactics.*

58. That's going to be the case here, as correspondence among counsel show. Defendant fought this matter tooth and nail; yet, as is the case in other matters we and others have handled against them, will protest that it shouldn't have taken so much effort to beat them.

59. Even though caselaw holds that lawyers are expected to collaborate and may bill for that time, Plaintiff's counsel testify that in the exercise of billing discretion, they made efforts to prevent or eliminate excess or duplicative fees from the involvement of multiple members of the team on certain tasks. Thus, the opposing parties are obtaining a greater value than they should.

60. Accordingly, it is not unusual for more than one attorney or more than one law firm to work together on cases like this one. The fact that one or more attorneys may take the laboring oar in writing a substantive brief does not mean that another attorney's review of, comment on, and correction to that motion is duplicative, wasteful, or inefficient. To the contrary, the collaborative effort is often productive and the end work product far better and more effective. Our own office's practice is to have at least two attorneys, and sometimes three, edit every brief to present the courts with our best work product. Here, I found no evidence of unnecessary or duplicative work.

61. But I did review world-class complaint and briefing by Plaintiff's counsel reflecting the level of polish and perfection that this Court deserves. The work by Plaintiff's counsel in this matter was thorough and well written, allowing for a professional, succinct, and complete presentation of the facts and law to the Court. The work itself was of a high caliber that would be expected from competent, knowledgeable attorneys who are experienced and accomplished in this sort of litigation.

62. The fact that Plaintiff's counsel here was able to expend so little time through obtaining both a temporary restraining order (which was tantamount to obtaining a preliminary injunction given the TRO's indefinite nature) and a final-judgment victory is nothing short of remarkable.

## CASE EXPENSES

63. I have reviewed the case expenses advanced by counsel on Plaintiff's behalf (the filing fee) and view them as negligible, given the nature of the litigation and the tenacious defense faced. Plaintiff could have charged for computerized-legal-research-database usage and travel time, but didn't.

## CONCLUSION

64. Having considered the matters enumerated in Prof. Cond. Rule 1.5, I find, to a reasonable degree of professional certainty, the hourly rates and time Plaintiffs' counsel are requesting to be appropriate and reasonable given both the work required in cases of this sort and the

work performed—and given the favorable result against the odds and a tenacious defense. So are the case expenses.

65.     Paying for counsel for all their time at market rates is a cost of violating civil-rights law. Fee-shifting statutes and punitive-damages-based fee shifting are designed to hold defendants particularly accountable.

66.     My fee for the work associated with preparing this affidavit would be charged at my current standard hourly rate of **$600**, and with over 7.5 hours invested but time voluntarily removed, totals thus far **$4,500** for the work provided, plus time that will be spent preparing to testify and testifying if needed.

I affirm the above to be true and accurate to the best of my knowledge under penalty of perjury.

_____
Subodh Chandra
March 20, 2024

**MR. SUBODH CHANDRA**

THE CHANDRA LAW FIRM LLC ♦ 1265 W. 6TH STREET, STE. 400 ♦ CLEVELAND., OHIO 44113.1326 ♦ 216.578.1700
SUBODH.CHANDRA@CHANDRALAW.COM ♦ WWW.CHANDRALAW.COM

## EMPLOYMENT EXPERIENCE

2005–PRES.   **THE CHANDRA LAW FIRM LLC.** Cleveland, OH. MANAGING PARTNER. Practice includes high-profile and complex civil-rights, constitutional, police-misconduct, voting rights, First Amendment, employment, and business trial-and-appellate litigation; white-collar-criminal defense; professional ethics; internal investigations; and conducting mediations.

♦   Multimillion-dollar civil-rights trial verdicts and settlements. Successfully defended healthcare-, mortgage-, telecommunications-, and telemarketing-fraud allegations.

♦   Emphasis on client crisis-communications strategies in matters of public interest.

♦   Noteworthy matters include

- Co-represented estate and family of Tamir Rice, 12-year-old child slain by Cleveland police, resulting in $6 million record settlement;

- Co-represented comedian/commentator Dean Obeidallah in libel suit against white-supremacist Andrew Anglin and *The Daily Stormer*, resulting in $4.1 million judgment;

- Led First Amendment–retaliation representation of Republican National Convention protestors resulting in nearly $1 million in settlements from City of Cleveland;

- Ten years of successful litigation with co-counsel on behalf of homeless advocates, individuals, and labor union to secure the right to vote in Ohio; and

- Led retaliation suit against Case Western Reserve University Law School dean (resolved).

♦   Championed excellence in legal writing and mentored others, leading to bar-association award.

♦   Inducted by peer review into Best Lawyers in America® for civil rights; Ohio SuperLawyers®.

♦   Firm inducted into *U.S. News & World Report*'s Best Law Firms in America® for civil rights.

♦   Lawyer of the Year for Civil Rights from Best Lawyers in America® (2021).

♦   Member, Legal Network for Gender Equity, for representing sexual-harassment victims.

♦   *Pro bono* focus on counseling rape victims through the criminal-justice process.

2004–05   **CASE WESTERN RESERVE UNIVERSITY SCHOOL OF LAW.** Cleveland, OH. DISTINGUISHED PRACTITIONER IN RESIDENCE AND ADJUNCT PROFESSOR OF LAW. Taught courses in legal ethics and appellate practice; helped reform practical-skills curriculum, and developed city externship.

2002–05   **CITY OF CLEVELAND.** Cleveland, OH. DIRECTOR OF LAW AND PROSECUTING ATTORNEY. Served as general counsel, and sometimes as acting mayor, of billion-dollar municipal corporation.

♦   Led turnaround of 85-lawyer law firm with civil and criminal divisions by instituting standards of excellence and systems of accountability.

♦   Counseled mayor; various departments (including nation's 10th largest public-water utility, largest state public-electric utility, and international airport); and city-council members.

♦   Conducted numerous internal-fraud, public corruption, and ethics investigations, resulting in large recoveries to city coffers. Hands-on litigation, prosecutorial, legislative, and transactional work, including in civil-rights, employment, and First-Amendment disputes; criminal-charging decisions in police use-of-deadly-force cases; environmental defense of airport expansion; and economic-development projects.

♦   Creatively settled Innocence Project's wrongful-conviction case, *Green v. City of Cleveland*—hailed as national model (*see* accompanying Connie Schultz article), and U.S. Department of Justice civil-rights investigations into police use of deadly force and jail conditions.

♦   Raised charging standards in criminal division from probable cause to beyond a reasonable doubt, to be consistent with federal-criminal-prosecution standards.

♦   Helped craft and lead defense of City's anti-predatory-lending ordinance.

PLAINTIFF'S EXHIBIT

2-1

- ♦ Led defense and negotiations with U.S. Department of Transportation of ordinance setting aside employment for city residents.
- ♦ Served on team preparing City's homeland-security readiness, post 9/11.
- ♦ Trained lawyers in legal-writing best practices and personally edited all case-dispositive motions and appellate briefs.
- ♦ Developed ethics protocol and served as chief ethics officer.
- ♦ Recruited staff from top law firms and corporations, improved morale, and reduced voluntary turnover by two thirds over two years.
- ♦ Slashed outside-counsel spending by 90%.
- ♦ Increased proportion of minority lawyers at the line level **from 23% to 34%**, and in management **from 20% to 31**%.
- ♦ Raised percentage of racial-minority lawyers in the criminal division in our majority-minority city **from *zero* to a *majority***.

1999–02    **UNITED STATES DEPARTMENT OF JUSTICE.** Cleveland, OH. ASSISTANT UNITED STATES ATTORNEY. Prosecuted complex federal economic crimes at trial and appellate levels.
- ♦ Coordinated and oversaw complex, multiple-target investigations with federal and state interagency task force.
- ♦ Prosecuted criminal healthcare fraud and corruption, money laundering, and mail-, wire-, tax- and bank-fraud schemes.
- ♦ Negotiated guilty pleas and tried cases resulting in conviction of numerous criminal defendants.
- ♦ Briefed and argued appeals resulting in leading opinions on subpoena enforcement and privilege.
- ♦ Special commendations for "demonstrated excellence" in prosecuting 23 healthcare-fraud cases from FBI Director Robert Mueller; Cleveland FBI Special Agent in Charge Mark Bullock.

1997–99    **THOMPSON HINE & FLORY.** Cleveland, OH. LITIGATOR. Litigated trade-secret, contract, and employment cases in federal and state courts. Recruited clients to firm. *Pro bono* racial-profiling case.

1996–97    **CHRISTENSEN, MILLER, FINK, JACOBS, GLASER, WEIL & SHAPIRO.** Los Angeles, CA. LITIGATOR. Represented entertainment-industry, elected-official, and city clients, including motion-picture studios, current and former Los Angeles mayors, city-council members, police-commission members, and Beverly Hills police officials, in complex business disputes, libel defense, and high-profile misconduct cases.

1994–95    **AMERICAN BAR ASSOCIATION.** Albuquerque, NM. SPECIAL PRESIDENTIAL COUNSEL. Helped develop reform initiatives for leader of world's largest professional organization in civil- and criminal-justice reform, domestic violence, legal-aid preservation, professional ethics, and human rights.

## OTHER PROFESSIONAL EXPERIENCE

2013–PRES.    **OHIO ADVISORY COMMITTEE TO THE U.S. COMMISSION ON CIVIL RIGHTS.** CO-VICE CHAIR; MEMBER. Serve as special federal-government employee on bipartisan advisory committee to the U.S. Commission on Civil Rights. Conducted public hearings on civil-rights issues, and helped forge consensus around special reports to the Commission on voting-rights, human trafficking, education funding, and equity in healthcare delivery during COVID-19 pandemic. Elected co-vice-chair in 2022.

1992    **OFFICE OF GOVERNOR ANN W. RICHARDS.** AUSTIN, TX. LAW CLERK TO GENERAL COUNSEL. Developed strategy for more racially diverse but constitutional contracting.

1991    **OFFICE OF GOVERNOR DAVID M. WALTERS.** OKLAHOMA CITY, OK. POLICY ANALYST. Developed strategy for broader diversity in governor's political appointments.

1990–91    **PARTICIPATION 2000.** COLUMBUS, OH. ASSISTANT DIRECTOR FOR INTERNATIONAL AFFAIRS. Institute founded by Ohio Governor Richard F. Celeste. Developed and administered, for young

Central and Eastern European leaders from emerging democracies, campaign-skills training program placing participants in American campaigns. Participants are now major leaders in home countries.

## BAR MEMBERSHIPS AND PROFESSIONAL ASSOCIATIONS

- **CLEVELAND METROPOLITAN BAR ASSOCIATION (PREVIOUSLY CLEVELAND BAR ASSOCIATION).** PREV. CHAIR, VICE-CHAIR of Judicial Selection Committee, rating judicial candidates with coalition of bar associations (Judge4Yourself.com). PREV. MEMB. of Board of Trustees, PREV. CO-CHAIR of Diversity Action Committee whose innovations in diversity-pipeline and management led to 2007 American Bar Association Partnership Award; MEMB. COVID-19 Bench-Bar Task Force, civil and mediation subcommittees.
- **OHIO AND CLEVELAND EMPLOYMENT LAWYERS ASSOCIATIONS**
- **FEDERAL BAR ASSOCIATION** (CIVIL-RIGHTS SECTION)
- **OHIO STATE BAR ASSOCIATION** (LITIGATION AND LABOR & EMPLOYMENT SECTIONS; ETHICS COMM.)
- **AMERICAN CONSTITUTION SOCIETY**
- **AMERICAN BAR ASSOCIATION** (MEMB. OF LITIGATION OF CRIMINAL-JUSTICE SECTIONS OFF AND ON)
- **SOUTH ASIAN BAR ASSOCIATION OF NORTH AMERICA AND NATIONAL ASIAN PACIFIC AMERICAN BAR ASSOCIATION.** MEMB. OF JUDICIAL-SELECTION COMMITTEE OF ASIAN-AMERICAN BAR OF OHIO
- **NORMAN S. MINOR BAR ASSOCIATION**
- **EIGHTH DISTRICT JUDICIAL CONFERENCE** (LIFE MEMB.)
- **CUYAHOGA COUNTY BAR ASSOCIATION** (NOW DEFUNCT; FORMER VICE CHAIR OF JUDICIAL-SELECTION COMMITTEE)
- **AMERICAN INNS OF COURT, HAROLD BURTON CHAPTER** (1998–01)

## COMMUNITY INVOLVEMENT (PARTIAL LISTING)

2021–22.  **U.S. ATTORNEY/U.S. MARSHAL SCREENING PANEL.** MEMBER. Served on committee assisting Senators Sherrod Brown and Rob Portman in screening applicants for Southern District of Ohio presidential nominations.

2006–PRES.  **CLEVELAND RAPE CRISIS CENTER.** SING OUT! FUNDRAISING CHORALE MEMBER AND SOLOIST.

2013  **CUYAHOGA COUNTY TRANSITION TEAM, CAMPAIGN-FINANCE-REFORM COMMITTEE.** MEMBER. Assisted with the transition to a single-executive government under a new charter.

2011–12  **CANDIDATE FOR CUYAHOGA COUNTY PROSECUTING ATTORNEY.** Ran as a criminal-justice reform candidate in the Democratic primary on a "smart-on-crime" platform.

2008  **VOTE EARLY, VOTE BIG!** Founder and chair of the nonprofit and nonpartisan "souls-to-the-polls" program in partnership with Cleveland NAACP, commemorating history of voting rights and turning out tens of thousands of African-American churchgoing voters in Cuyahoga and Summit Counties.

2007–08  **OBAMA FOR AMERICA.** Served as a National Finance Committee member, National Asian-American Advisory Committee member, delegate to and deputy whip of the Ohio delegation to 2008 Democratic National Convention. Organized first and dozens of Ohio events for candidate.

2005–06  **CANDIDATE FOR OHIO ATTORNEY GENERAL.** Ran on reform platform following corruption scandals. Endorsed by most newspapers; *Cincinnati Enquirer*: "The best candidate Ohio Democrats have produced in years." *Dayton Daily News*: "Ohio's answer to Barack Obama."

2004; 09, 15, 20  **U.S. MAGISTRATE SELECTION PANELS.** Advised district court in selecting U.S. Magistrate judges.

2004  **SOUTH ASIAN AMERICANS LEADING TOGETHER.** CO-FOUNDER. National, nonpartisan, non-profit organization that fights for racial justice and advocates for the civil rights of all South-Asians Americans.

2003    **RACIAL FAIRNESS COMMISSION.** Co-chaired benefit event featuring Rep. John Lewis for project to implement recommendations to improve access to, and racial fairness of, Ohio justice system.

1998–PRES.    **YALE LAW SECTION OF YALE ALUMNI ASSOCIATION OF CLEVELAND.** CHAIR. Former member of Yale Law School's Executive Committee. Remain active mentoring students through career office.

1998–2001    **NETWORK OF INDIAN-AMERICAN PROFESSIONALS.** FOUNDER, SOUL TO SOUL. Organized program to build stronger relations between the Indian-American and African-American communities in Cleveland; helped lead groundbreaking of India Cultural Garden.

2000–02    **CLEVELAND JUVENILE COMMUNITY-DIVERSION PROGRAM.** VOLUNTEER MAGISTRATE.

## HONORS AND AWARDS (PARTIAL LISTING)

2021    **LAWYER OF THE YEAR FOR CIVIL RIGHTS.** BEST LAWYERS IN AMERICA®.

2020    **BEST BRIEF—PRIVATE SECTOR.** OHIO STATE BAR ASSOCIATION. (Shared with colleague Sandhya Gupta.) For Supreme Court of Ohio merit brief in *Buddenberg v. Weisdack.*

2011    **ADVOCATE OF THE YEAR.** NORTHEAST OHIO COALITION FOR THE HOMELESS. For successful litigation to protect the rights of homeless people to vote in person.

2007    **PARTNERSHIP AWARD.** AMERICAN BAR ASSOCIATION. Accepted award on behalf of the Cleveland Bar Association for Diversity Action Committee's groundbreaking diversity and pipeline initiatives undertaken under my leadership as committee co-chair.

2002    **CREATING-A-VOICE AWARD.** PROJECT IMPACT. For groundbreaking Indian-American career achievement. Winners included filmmaker M. Night Shyamalan and Astronaut Kalpana Chawla.

2002    **40-UNDER-40 AWARD.** CRAIN'S CLEVELAND BUSINESS. For young Cleveland leaders.

2002    **COMMENDATION FROM ROBERT MUELLER, FBI DIRECTOR.** For "demonstrated excellence" in prosecution of corruption and fraud in the healthcare industry.

1995    **OUTSTANDING LAWYER.** NEW MEXICO BAR FOUNDATION & ALBUQUERQUE BAR ASSOCIATION. Award for innovation and excellence in teaching law to public high-school students.

1989–90    **JOHN GARDNER FELLOWSHIP.** HAAS CENTER FOR PUBLIC SERVICE, STANFORD UNIVERSITY. Funded public-service mentorship with Ohio Governor Richard F. Celeste described above.

## EDUCATION

1991–94    **YALE LAW SCHOOL.** New Haven, CT. *J.D.* Executive Editor, YALE LAW & POLICY REVIEW; Member, YALE JOURNAL OF LAW & FEMINISM; Director, *Law Revue!* (satirical, musical show).

1985–89    **STANFORD UNIVERSITY.** Stanford, CA. *A.B.* with honors and dual-departmental distinction in both political science and sociology. Interdisciplinary study of civil-rights history and law; and race and ethnic relations. Elected to *Phi Beta Kappa* junior year. *Alpha Kappa Delta* international sociology honor society.

## NOTEWORTHY CASES (PARTIAL LISTING)

♦   *Winston, Administrator of Estate of Tamir Rice v. City of Cleveland*, No. 1:14-cv-2670 (N.D. Ohio 2016) (working with co-counsel, secured $6 million record settlement for Cleveland police shooting of 12-year-old Tamir Rice).

- *Obeidallah v. Anglin*, (S.D. Ohio 2019) (with co-counsel, secured $4.1 million libel judgment for comedian commentator Dean Obeidallah against white-supremacist Andrew Anglin and his website *The Daily Stormer*).

- *Lockhart v. Woodmere*, No. 1:07-cv-2517 (N.D. Ohio 2008) ($2 million+ Title VII and First Amendment–retaliation jury-trial verdict for African-American police chief against mayor and village).

- *Green v. City of Cleveland*, No. 1:03-cv-0906 (N.D. Ohio 2003) (forged settlement hailed by Innocence Project as national model, on Cleveland's behalf with Anthony Michael Green, who was wrongfully convicted of rape and served 13 years in prison because of civil-rights violations. Agreed to reopen over 100 cases involving the same responsible forensic analyst, appoint a DNA-evidence special master, and perform testing to identify others wrongfully convicted—this resulted in identification of others) (column about this attached).

- *Northeast Ohio Coalition for the Homeless and Service Employees International Union Local 1199 v. Blackwell*, No. 2:06-cv-896 (S.D. Ohio) (with co-counsel engaged in ten-year span of successful litigation on behalf of homeless advocates, individuals, and labor union against three Ohio secretaries of state of both political parties to secure right of homeless and impoverished people. Extensive discovery; briefing; evidentiary hearings; complex negotiation of interim and final consent decrees, litigating over breaches and filing supplemental complaints, trial, and appeals. Issues included vote-suppressing effects of voter-ID statute and process for casting and counting of provisional and absentee ballots).

- *Northeast Ohio Coalition for the Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012) (with co-counsel, ensured counting of provisional ballots of voters who are misdirected by pollworkers to vote in the wrong precinct).

- *NEOCH v. Husted*, 837 F.3d 612 (2016) (with co-counsel, secured appellate win for absentee-ballot voters against Ohio's "perfect-form" requirements for filling ballot forms, after broader federal-district-court trial win).

- *Lavin v. Husted*, 689 F.3d 543 (6th Cir. 2012) (First Amendment victory for physician plaintiffs, reversing district court, and declaring unconstitutional statute barring attorney general and prosecutor candidates from accepting contributions from Medicaid providers); *Lavin v. Husted*, 764 F.3d 646 (6th Cir. 2014) (reversing district court for failing to award reasonable attorneys' fees, and remanding to a different district-court judge—leading Sixth Circuit decision on fee-shifting).

- *Boustani v. Blackwell*, 460 F. Supp. 2d 822 (N.D. Ohio 2006) (with co-counsel, successful voting-rights challenge to Ohio statute authorizing pollworkers to discriminate against naturalized U.S. citizens in voting).

- *Nelson v. Bahama Breeze,* No. CV-18-903466 (Cuy. Cty. Comm. Pls. 2018) (secured resolution for 21 African-American diners against restaurant chain and managers for race-discrimination-in-public-accommodations claim).

- *Glass v. Clark*, Nos. 1:20-cv-2041/1:19-cv-1825 (N.D. Ohio) (represent Cuyahoga County jail-torture victim who was restrained in a chair and pepper-sprayed and alleging racially disparate treatment for failure to decontaminate).

- *Ku v. Mitchell*, No. CV-13-815935 (Cuy. Comm. Pls. Ct.) (secured resolution for law professor/former associate dean for retaliation by Case Western Reserve University law-school dean over sexual-harassment reports).

- *Ortiz v. Kazimer*, 811 F.3d 848 (6th Cir. 2016); *Ortiz v. City of Cleveland*, No. 1:16-cv-2529 (N.D. Ohio 2016) *Ortiz v. City of Cleveland*, No. 1:16-cv-2529 (N.D. Ohio 2016) (obtained settlement from City after decision denying qualified immunity to officers who attacked 16-year-old Latino child with Down syndrome).

- *Ali v. City of Cleveland*, No. 17-cv-634 (N.D. Ohio 2017) (secured First Amendment–retaliation settlements and OSHA judgments exceeding $520,000 for whistleblowing Cleveland airfield-maintenance manager who informed FAA about unsafe runway conditions and City's failure to comply with its FAA rules).

- *Novak v. City of Parma*, 932 F.3d 421 (6th Cir. 2019) (affirming parodist's First Amendment right to mock police).

♦ *DeCrane v. Eckart*, 12 F.4th 596 (6th Cir. 2021) (the leading (along with *Buddenberg*, below) public-employee First Amendment–retaliation case in the Sixth Circuit; affirming denial of summary judgment in favor of our former fire-battalion-chief client and remanding for trial).

♦ *Buddenberg v. Weisdack*, 939 F.3d 732 (6th Cir. 2019) (groundbreaking case establishing right to sue employment-defense attorneys for participating in illegal Title VII and First Amendment retaliation).

♦ *Buddenberg v. Weisdack*, 2020 Ohio 3832, 109 NE 3d 1259 (2020) (on certified question from federal court above, secured Ohio Supreme Court victory establishing no conviction prerequisite under R.C. 2307.60 and 2921.03 before crime victims may sue their perpetrators civilly—groundbreaking case opening new causes of action).

♦ *Jacobson v. Kaforey,* 2016-Ohio-8434, 149 Ohio St. 3d 398 (2016) (Ohio Supreme Court victory establishing independent civil cause of action under R.C. 2307.60 for crime victims to sue their perpetrators civilly).

♦ *Johnson v. City of Cleveland*, (N.D. Ohio 2019) (secured nearly $1,000,000 in settlements for peaceful protestors at the 2016 Republican National Convention).

♦ *Kesterson v. Kent State Univ.*, No. 5:16-cv-298 (N.D. Ohio 2016), Sixth Cir. App. Nos. 18-4200, 19-3080 (with co-counsel, obtained Title IX/First Amendment–retaliations settlement for softball player raped by coach's son).

♦ *White v. Akron Beacon Journal Publishing Co.*, No. 5:09 CV 2193 (N.D. Ohio 2010) (obtained injunction, followed by favorable settlement, against major newspaper—and order that millions of dollars in promised union-retiree healthcare benefits be restored under ERISA). Similar favorable result in related case: *Olesky v. Beacon Publishing Co.*

♦ *Williams v. Cleveland Clinic Foundation*, No. 1:15-cv-2496 (secured resolution for deaf plaintiff over ADA claims about deficient deaf-interpretation services).

♦ *Evans v. Ohio Lottery Comm'n*, No. 1:15-cv-164 (N.D. Ohio 2015) (secured settlement for African-American female lottery-commission employee for race-discrimination, gender-discrimination, and First Amendment–retaliation claims arising from unequal pay for the same work previously performed by a white male).

♦ *J.G. v. Jones,* No. 1:17-cv-1171 (N.D. Ohio 2017) (obtained settlement from Lakewood library and judgment from City of Lakewood for African-American girl attacked by police officer at library—resulting in broken jaw, and her younger brother, who was traumatized by the incident).

♦ *United States v. City of Cleveland* (N.D. Ohio 2004) (negotiated consent decree for Cleveland with the Department of Justice to curb police use of deadly force and ensure proper officer training; oversaw drafting of new policies).

♦ *Raycom v. Campbell*, 361 F.Supp.2d 679 (N.D. Ohio 2004) (successful defense of Cleveland mayor in First Amendment–retaliation suit by WOIO Channel 19's parent company).

♦ *Youngstown Publishing Co. v. McKelvey*, 189 Fed. Appx. 402 (6th Cir. 2006) (secured trial and appeals-court defense victories in First Amendment–retaliation case brought by reporters and editor against Youngstown's mayor).

♦ *Doe v. United States*, 253 F.3d 256 (6th Cir. 2001) (established broad subpoena authority for administrative subpoenas in healthcare-fraud criminal investigations, to establish whether investigatory targets had intent).

♦ *Healthcare-fraud-and-corruption series* (secured about 22 convictions most through guilty pleas of physicians, chiropractors, podiatrists, and companies that took kickbacks in return for referrals for often medically unnecessary electrodiagnostic testing. One case went to trial and resulted in a conviction. Award from FBI Director Robert Mueller).

♦ *United States v. Wade*, No. 4:01-cr-00176 (N.D. Ohio 2002) (co-prosecuted trial of recidivist bank-fraud ringleader; resulted in conviction).

- *State v. Wells, et al.*, Cuy. Cty. Comm. Pls. Ct. Case No. CR-06-490671 (secured dismissal of criminal-mortgage-fraud charges against two defendants, while 30+ others represented by other counsel were convicted).

## NOTEWORTHY SEMINARS PRESENTED

2021    *Attorneys' Fees Petitions in Fee-Shifting Cases, including Civil Rights and Employment*, Legal Aid organizations in OH

2021    *Leveraging Media Strategically and Ethically, for Your Clients' Cases and Causes*, Legal Aid organizations in OH

2021    *Disqualifying Opposing Counsel Over Improper Joint Representations*, Legal Aid organizations in OH

2021    *Malicious Prosecutions Under Section 1983 and Ohio Law*, Legal Aid organizations in OH

2021    *First Amendment Retaliation, Interference with Civil Rights, and Dereliction of Duty*, Legal Aid organizations in OH

2021    *Ohio Civil Liability for Criminal Acts and Intimidation*, Legal Aid organizations in OH

2021    *How to Write a Garner-Style Deep Issue*, Legal Aid organizations in OH

2021    *How to Spot a Good Civil-Rights Case—Or a Bad One*, Legal Aid organizations in OH

2021    *Basics of Section 1983, Qualified Immunity, & Monell Liability*, Legal Aid organizations in OH, WV, and MI (nat'l broadcast) (first of a half-year series on various civil-rights topics)

2021    *Strategic and Ethical Engagement with Media for Your Clients' Cases and Causes*, Cleveland Employment Inn of Court

2020    *Disqualify! Holding Defense Counsel Accountable for Improper Joint Representations and Preserving the Integrity of the Proceedings*, Cleveland Employment Lawyers Association

2020    *Tamir Rice, Unjustified Police Violence—and the Free Pass of Qualified Immunity*, American Constitution Society, Columbus Chapter (national video presentation)

2020    *Employment-Litigator Besties: R.C 2307.60 (Civil Action for Damages for Criminal Act); and R.C. 2921.03 (Intimidation—false writings)*, Ohio Employment Lawyers Association

2019    *Leveraging Media Ethically, for Your Clients' Cases and Causes*, Cleveland Employment Lawyers Association

2019    *Throwing the Case: How Prosecutors Gave Police Officers Special Treatment and Denied Tamir Rice's Family Equal Justice*, (presented separately at both Stanford Law School and Yale Law School)

2016    *Impact of the New Federal Civil Rules Amendments—Plaintiffs' Bar's Perspective on the New Proportionality-in-Discovery Rule*, Ohio State Bar Association Federal Courts & Practice Committee Bench Bar Conference

2016    *A Crime-Victim Advocate's Account of How Tamir Rice's Family was Denied Equal Justice*, Cleveland Metro. Bar Ass'n

2015    *R.C. 2921.03 Intimidation: The Fee-Shifting, Civil-Liability, Felony Statute Hidden in the Criminal Code that Should Be the Ohio Employment Plaintiff Lawyer's Best Friend*, Cleveland Employment Lawyers Association

2014    *Trends in Challenges to Voting Rights Over the Last Decade and Projected Through 2016: Ohio As Ground Zero*, National Asian Pacific American Bar Association Central Regional Conference

2013    *Attorneys' Fees in Employment and Civil-Rights Cases*, Cleveland Employment Lawyers Association Annual Seminar (with Sandhya Gupta)

2013    *Inside View on Effectively Communicating Employment Issues with In-House Counsel*, Clvd. Employment Inn of Court

2012    *Showcase Closing Argument: Lockhart v. Village of Woodmere, et al.*, Ohio State Bar Association Annual Convention

2010 *Professionalism in Litigation*, 8th Annual Trial Advocacy Institute, National Institute for Trial Advocacy

2005 *Professionalism: Lessons From Game Theory*, Cleveland Bar Association Annual Trial Advocacy Institute

2005 *Appellate Practice*, taught while running moot-court program as distinguished practitioner-in-residence and adjunct professor, Case Western Reserve University School of Law

2004 *Showcase federal appellate argument*, International Municipal Lawyers Association Annual Convention

2000 *The Federal Healthcare Antickickback Statute*, Office of Inspector General: Compliance Guidance for Physician Practices and Stark II

## BAR ADMISSIONS

- ◆ Ohio, California, and New Mexico (inactive)
- ◆ U.S. Supreme Court
- ◆ U.S. Courts of Appeals for the Third, Sixth, and Fourth Circuits
- ◆ U.S. District Courts for the Northern and Southern Districts of Ohio

## SELECTED PUBLICATIONS

Subodh Chandra and Sandhya Gupta, *Legal Challenge to Voter-Suppression Law on Trivial Errors seeks Supreme Court Review*, CIVIL RIGHTS INSIDER—Federal Bar Association Civil Rights Section Newsletter (Winter 2017)

Subodh Chandra and Sandhya Gupta, *Sixth Circuit Reverses Decades-Old Fees-for-Fees Standard, Yields Immediate Results for Civil-Rights Plaintiffs*, CIVIL RIGHTS INSIDER — Federal Bar Association Civil Rights Section Newsletter (Winter 2017)

Subodh Chandra, *It could have been my immigrant father. A visiting uncle. Or me.,* INDIA ABROAD (Feb. 27, 2015)

Subodh Chandra, *Charging Attorneys' Fees: Where Should the Line Be Drawn—A Plaintiff's Lawyer's Perspective*, THE FEDERAL LAWYER (Jun. 2013)

Subodh Chandra, *Welcome to America, Senator!*, THE AMERICAN PROSPECT (Aug. 23, 2006)

Subodh Chandra, *Law Practice Management: The Reform Experience of the Cleveland Department of Law*, CLEVELAND BAR JOURNAL (Jan. 2005)

Subodh Chandra, *Getting Back to Progress: Setting a New Civil Rights Agenda*, REASONABLE DOUBT (Win. 1988)

## SELECTED FILM, DOCUMENTARY, AND OTHER MEDIA CREDITS

137 SHOTS (NETFLIX 2021) (commentary regarding prosecutorial bias by prosecutors investigating police officers who killed Tamir Rice).

PAY 2 PLAY: DEMOCRACY'S HIGH STAKES (2014) (commentary regarding corruption in Ohio)

FREE FOR ALL! (2008) (commentary on voting rights)

SERIAL, NPR (SEASON 2) (commentary on inequities in the Cuyahoga County justice system)

OBJECTIVELY REASONABLE (stage play about the Tamir Rice case).

## PERSONAL

Triplet father. Enjoy acting, and singing rock, blues, folk music, and playing blues harmonica.

PLAINTIFF'S EXHIBIT

**2-2**

# Charging Attorneys' Fees: Where Should

## *A Plaintiff Lawyer's Perspective*

### BY SUBODH CHANDRA

You are the managing partner of a boutique civil-rights law firm. A prospective client calls you. She was a local-government employee who believes that her newly elected boss fired her in retaliation for her supporting his electoral opponent in his campaign. She was not a policymaker but a civil-service-protected, rank-and-file employee. She had earned about $30,000 annually. Being fired caused her household's near financial collapse. The local jobless rate had soared to more than 20 percent and finding a comparable job was impossible. All of this was emotionally devastating.

Your firm is selective. It declines to represent 95 percent of those seeking the firm's civil-rights representation. But the evidence initially presented about the political motive behind the firing makes this an intriguing First and Fourteenth Amendment retaliation case. And the client herself is compelling—you like her, she doesn't seem too greedy, and you think a jury will like her too. You believe in the Constitution and want to help her.

But by any measure, obtaining individual justice for a client like this will be costly. In a matter of a few months, fees and expenses will likely outstrip the case's economic damages value and is already well beyond the client's means. A quick settlement is unlikely; governmental actors don't change their minds easily, especially in politically sensitive cases where it is easier to push the pain of judgment day out a few years.

Fortunately, however, statutory fee shifting under 42 U.S.C. § 1988 exists. Because fees and costs will not be recovered for years, and because your firm will be personally bearing the case's financial risks, you have to spend a great deal of time initially screening and investigating this matter. (You also have to advise the client about the risk she faces of paying costs at the case's end should she lose.[1]) Indeed, you have generally spent significant time and incurred significant fees long before defense counsel even become aware that a case exists. This vigorous screening and pre-suit investigation prevents the filing of frivolous claims, and you hope and expect that courts would want to encourage and reward it.

Finally, after two months of your firm's intensive and fruitful legal research and fact investigation, you confirm your instincts and conclude, "We will fight for her. We will either obtain a decent settlement, or prevail at trial and on appeal. And the defendants will eventually pay for our work and reimburse our costs." A formal engagement agreement is signed accordingly.

Implicit in your decision to proceed is that by definition you will forego some other work, including from fee-paying clients,

**Plaintiff** continued on page 50

# the Line Be Drawn?

## *A Defense Lawyer's Perspective*

### BY LIZA FRANKLIN

In response to the fact that some public officials were dishonoring their oaths and abusing citizens under the color of law, Congress enacted 42 U.S.C. § 1983, also known as the Ku Klux Klan Act. The act was as honorable as it was necessary. Under § 1983, a citizen could sue public officials civilly for violating his or her civil rights. The damage award in an average case, however, did not make this area of law particularly attractive to private attorneys. Litigation is expensive—the cases are extremely labor-intensive, and a 40 percent contingency on a $10,000 damages award would not cover the incurred costs or keep the lights on in an attorney's office.

Enter 42 U.S.C. § 1988, under which attorneys' fees are paid by the loser. In *Riverside v. Rivera*,[10] the Supreme Court collected quotes from Congress on the purpose of § 1988. The Court cited a lower court with approval for the idea that "[t]he function of an award of attorney's fees is to encourage the bringing of meritorious civil rights claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel."[11]

The intent was not to create a new way to charge ridiculous amounts with no oversight. Rather, the Supreme Court noted:

> When a plaintiff succeeds in remedying a civil rights violation, the United States Supreme Court considers that plaintiff to have served as a "private attorney general," vindicating a policy that Congress considered of the highest priority. He therefore should ordinarily recover an attorney's fee from the defendant—the party whose misconduct created the need for legal action. Fee shifting in such a case at once reimburses a plaintiff for what it cost him to vindicate civil rights, and holds to account a violator of federal law.[12]

"[W]hat it cost him to vindicate that right" by "the bringing of meritorious civil rights claims," however, is not the only thing that has been encouraged. Rather, the pursuit of § 1988 awards has created some of the most blatant billing abuses ever filed in a court of law.

$863 to rent a van so that plaintiff's counsel could have exhibits driven to and from court every day (plus, of course, an

**Defense** continued on page 51

**PLAINTIFF** continued from page 48

that you would otherwise be doing. You do not know when—or even with certainty whether—your firm will be compensated. This sort of work is, at bottom, a form of gambling, even though you have some experience in "knowing when to hold 'em and when to fold 'em" and have "beat the house" a number of times.

Your firm—a collection of large-firm refugees—believes that every individual client deserves the same dedicated and rigorous representation that you all used to provide the Fortune 100. While others might cut corners, you understand the importance of investing expenses in your cases, just as a corporate fee-paying client would. The best experts cost money. Electronic research costs money. Court reporters cost money—a lot of money. You resist compromising your best professional judgment about how to advocate for your clients, even though some federal courts often seem to disagree that plaintiffs in fee-shifting cases deserve that same level of excellent representation.[2] But you must then recover fees toward the top of the market to be in a financial position to continue fee-shifting work at a top quality level. Otherwise, you would do your clients, the courts, and the public a considerable disservice, and the quality of your work, as well as your reputation, would be compromised.

The amount of work that this particular case actually winds up requiring at the district court alone, however, shocks your firm. Over two and a half years, most of your firm's lawyers have to work hard to overcome obstacles never anticipated. Among other things out of your control, the case winds up being transferred among multiple judicial officers.

Non-parties allied with the main defendant erect barricades to third-party e-discovery. But after months of litigation, you overcome them, exposing a broader civil-rights conspiracy than was originally known, and amend the complaint to name multiple defendants. The principal defendant's original lawyer—apparently realizing his client has lied under oath—withdraws from the case over a year into the representation. This requires "re-educating" new counsel about the case.

New defense counsel seek to jointly represent multiple defendants, who point the finger at one another. Committed to the proceedings' integrity, you first unsuccessfully try to persuade opposing counsel of the joint representation's impropriety, and then prepare and file a motion to disqualify. After extended briefing, a magistrate judge recommends disqualification; but the district court does not accept the recommendation. This fight over conflict consumes over a year. (And new counsel do not have the same ethical qualms about the main defendant's implausible explanations that the former ones did.)

Most motions in the case go through two such rounds of litigation, doubling fees, because the district court keeps delegating decision-making to the magistrate judge, and then objections are briefed to the district judge.

As plaintiff's counsel, by now you are accustomed to facing more significant discovery hurdles. Defendants are generally interested in little discovery other than boilerplate interrogatories and the plaintiff's deposition. Plaintiffs in civil rights cases, on the other hand, will often have far fewer documents than the entity being sued, with e-discovery a growing challenge and critical source of evidence. If a plaintiff's discovery production is modest, as it generally is, then

defense counsel do not need to spend as much time to review it, or to prepare for depositions in light of it. Here, as in many cases, you have to first fight vigorously for, and then wade through, many thousands of pages of documents produced by defendants and third parties, thus increasing fees.

*The best experts cost money. Electronic research costs money. Court reporters cost money—a lot of money. You resist compromising your best professional judgement about how to advocate for your clients, even though some federal courts often seem to disagree that plaintiffs in fee-shifting cases deserve that same level of excellent representation. But you must then recover fees toward the top of the market to continue fee-shifting work at a top quality level.*

This single case unexpectedly gobbles up a plurality of your firm's time, creating a "cash crunch" in which you continue to pay out of prior, hoarded fee-shifting revenue for overhead, personnel, advanced costs of other cases, etc. While you have been accustomed to the "feast or famine" nature of your practice, for the first time, you incur debt to keep operating and fulfill your obligations to existing clients. In the process, though, your firm roots out evermore devastating evidence of the elected official's political motive and generally dubious character.

There are two failed mediations, even though liability becomes crystal clear. Both required substantial preparation time; one was with an expensive private mediator. Throughout the case, the insurers are willing to pay less than you and your client collectively expect—and that gap widens over time as attorneys' fees and costs accumulate further.

Measurable economic damages over time shrink close to zero. Your firm becomes a victim of its own success for the client—two years into the case, you succeed, through a separate administrative proceeding, in getting your client her job back, along with her back pay. (You even pull off getting her a new boss she likes by exposing in companion, uncompensated civil litigation that the prior, retaliating boss had engaged in unrelated criminal behavior, to which he pleads guilty. This is just part of comprehensively fighting for the client.)

Some courts hold that such work in companion cases is compensable in federal fee shifting.[3] They would focus on whether time

**Plaintiff** continued on page 52

**DEFENSE** continued from page 49

hourly rate for the driver of said van). Cabs to and from court every day because the trial team would not catch a ride in the trial van. $3,000 in hotel rooms so that plaintiff's counsel would not have to commute to their suburban homes during trial. $500 in valet parking. One obviously can't stay in a hotel or use valet parking without

*What is lost in all of this is a sense of civic responsibility. We are not talking about one multinational corporation suing another multinational corporation. The loser in that case can simply lower dividend payments. Municipalities do not have that luxury. They cannot simply lower dividends or raise the prices of their product. We are talking about tax dollars collected from the citizens of the municipality, money that can no longer be used to serve those constituents.*

tipping, so hundreds of dollars in tips to room service and valets at said hotels. $685 for § 1983 treatises to stock the firm library. More than 200 attorney hours for several attorneys from plaintiff's counsel's firm to "observe" the trial. Literally thousands of dollars in meals for the trial team and other hungry people. 50 partner-level attorney hours (say $525 per hour) spent typing trial subpoenas. Hours spent learning how to download and use Skype, Summation, and "the cloud." Nearly 100 hours spent working on an internal firm budget and deciding how to staff the case. 100 hours spent by a partner to index the documents produced by the defendants. More than a 40-hour week of billable hours spent reading a summary judgment opinion. One firm billed **both** the $30,000 they paid to a temporary agency for a paralegal **and** over $200,000 in hourly bills for that same paralegal's time. And my personal favorite, $3.85 each for a Snickers bar and a bag of M and Ms from the Hotel Sofitel minibar (according to a receipt for contact lens solution submitted for payment, plaintiff's counsel went to Walgreens earlier that same day, but did not purchase the candy there).

First, some of these charges would seem to run afoul of the canons of ethics. No client should be billed for your candy. Ever. I cannot imagine a general counsel would continue to employ a firm that sent four partners to a routine status, then charged for each of those partners to prepare and photocopy memos to the file about said status (I hope the status of the case was good, at least). It would not happen, or at least it would not happen more than once.

That client, however, can defend itself by refusing to pay and firing the firm. In § 1988 cases, however, the municipal defendant cannot

fire the other side's attorney. The municipal defendant must spend weeks culling through hundreds of pages of records to individually object to the truly objectionable, file a drawn-out response, and rely on the court to take up the extremely labor-intensive task of ruling on those objections. This cannot be the image attorneys wish to portray, especially as court opinions about this conduct begin to roll in.

Second, what is lost in all of this is a sense of civic responsibility. We are not talking about one multinational corporation suing another multinational corporation. The loser in that case can simply lower dividend payments or dreams up ways to increase revenue to make up the cost. Municipalities do not have that luxury. They cannot simply lower dividends or raise the prices of their product. We are talking about tax dollars collected from the citizens of the municipality, money that can no longer be used to serve those constituents. Those millions of dollars cannot repair bridges, staff mental health clinics or, yes, hire police officers to fight crime. In that sense, one case is not "one case." It is a case that impacts more than that one plaintiff. I believe that attorneys, officers of the court, must take that responsibility seriously. "Private attorney general" should mean exactly that—private individuals taking the needs of more than themselves into consideration.

Rather than abusing that responsibility, prevailing attorneys should take the words of the Supreme Court seriously:

> Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission.[13]

I would never say that there are no meritorious cases. I am a defender of police, not a lunatic. But if the three city lawyers and one paralegal can take a case to trial, perhaps the plaintiff can make do with fewer than 19 billing attorneys and 11 paralegals. And buy their own M and M's. ⊙

*Liza Franklin is a deputy corporation counsel for the City of Chicago's Department of Law, Federal Rights Litigation Division. The division she heads is tasked with defending Chicago police officers in intentional misconduct cases brought in state and federal court. Significant cases include all of the ones you read about in the paper. Prior to joining the city in 1997, Franklin was an associate at a large firm where she never gave any thought to who defends police officers. She is a graduate of the University of Chicago Law School and the University of Illinois at Urbana-Champaign.*

### Response by Subodh Chandra

I too, snicker at Liza Franklin's Snickers bar story. Actually, I cringe. A lawyer who leaves something like that (or a bill for contact lens solution for that matter) on a fee motion invites criticism that tarnishes us all. One would hope that the lawyer stung by Franklin's

**Defense** continued on page 53

**PLAINTIFF** continued from page 50

for which compensation is sought on a related case was "expended in pursuit of a successful resolution of the case in which fees are being claimed"[4] and would "'have been undertaken by a reasonable and prudent lawyer to advance or protect his client's interest' in this case."[5] Other courts might interpret these successes through the lens of the Supreme Court's decision in *Buckhannon v. Board and Care Home, Inc. v. West Virginia Department of Health & Human Resources*,[6] finding that there was no federal judicial decision altering the parties' legal relationship, and that the work, however fruitful for your client, is thus not compensable.

You consider yourself reasonable, and more than prudent, and so you do the work regardless, to advance your client's interests.

Insurance-adjuster bean counters generally tend to be unable to grasp the concept of non-economic, e.g., emotional damages, much less punitive-damages exposure faced by individual defendants, for which governments and insurers are not often not contractually or legally responsible. And governments and insurers balk at paying attorneys' fees and costs, despite being exposed to them, thus belying most economists' assumptions of rationality. When they consider paying, they want pay at rates they pay their own insurance-defense counsel, which is less than you and comparably credentialed firms bill out your paralegals.

The denial is particularly acute in your case. And so the case keeps going, and the evidence keeps accumulating. And so do attorneys' fees and advanced costs in what has now become a case that resembles the plight of the unsupervised children in *Lord of the Flies*. Defendants twice breach mediation confidentiality, presumably to try to make your camp look unreasonable to a judge with a busy docket. This results in further contentiousness. The court is nonchalant about the breaches, but they make your client distrust the justice system—after all, judges promised confidentiality. This results in your needing to spend substantial time to help your client remain sane about the process.

In a long-awaited status conference, defense counsel collectively "pile on" regarding fee expectations, causing the district-court judge to make hostile comments about fees. The judge has not reviewed your contemporaneously recorded time records, but cannot comprehend that at the end of two and a half years, your firm genuinely finds itself with $1.75 million in lodestar fees (fees that you would have charged fee-paying clients at your usual hourly market rates for such litigation), and $65,000 in hard, out of pocket expenses, to overcome the very obstacles that defendants and third parties erected, and make your case. (Each deposition transcript costs $1,000 to $3,000; multiply that by the number of witnesses and defendants in this case, and then by the breadth of your portfolio of cases, and you have a lot of personal chips on a lot of tables you are playing simultaneously. The client may be technically responsible under your engagement agreement to reimburse you for out of pocket costs when the case ends, but she is uncollectable.) The judge, in the presence of defense counsel, threatens a "line by line" review of billing entries and expresses enthusiasm at the prospect of gutting time from it.

Emboldened by the judge's comments, the insurance company dangles an "offer" that provides the client with a windfall as to the case's remaining value—but borders on calamitous for the lawyers who worked to get her there. It represents pennies on the dollar of time and money invested in the case. What do you do?

Because you put your clients first, you settle the case for the client's benefit. (You also know that you and your client are facing up to two more years of interlocutory appeal time on even a meritless summary-judgment motion based on qualified-immunity before ever seeing a trial, and potentially years more litigating fees after any trial.)

But you then wonder how you are now going to compensate your people—all highly credentialed—to keep them. Because they have been living on fumes while this case has consumed the firm's time. And you wonder how and whether you are going to continue this type of practice. Because even when your cause is righteous, it is, after all, gambling. Little different from that practiced in those casinos that were just built downtown.

Congress adopted the civil rights fee-shifting statute, 42 U.S.C. § 1988, to attract competent attorneys to provide clients with civil-rights concerns with meaningful access to justice, that is, to create a system of "private attorneys general" to vindicate the constitutional rights that we hold so dear. Congress could have never anticipated, however, the degree to which the justice system makes litigating the underlying case, and recouping attorneys' fees and advanced out-of-pocket costs, such a challenge. Nor could it have appreciated that the lawyers willing to do the work required—at the level of rigor and excellence we all ought to expect—would have to have enormous, and perhaps irrational, appetites for risk.

There is, as described above, a fundamental disconnect between the actual work required to do a first-rate job for clients in civil-rights cases and the willingness of some courts to award a fully compensatory fee. Lawyers who help their clients prevail are entitled to fees, yet district courts seem more than willing to second guess their professional judgment and subject their bills to a brand of post hoc slashing in which fee-paying clients rarely have the opportunity to engage. Perhaps this is because taxpayers are usually footing the bill, although the Supreme Court has held that that is irrelevant to the fee analysis.[7] Some courts cannot help being put off by fee and cost petitions that far exceed damages, even though that is perfectly legal,[8] and indeed, to be expected if lawyers are doing their jobs in these cases. Because decisions taking hatchets to fees are subject to an "abuse of discretion" standard, reviewing courts are often reluctant to disturb even the stingiest awards.

All this flies in the face of the principle that lawyers' own professional judgment should be trusted.[9] Given the challenges described above, plaintiffs' counsel in fee-shifting cases, who can only earn a living by spreading their risk, have a built-in incentive to minimize costs and the efficiency of time expended generally. In my experience, all will try to do so, but only the *good* ones will nevertheless embrace the greater risk of doing the good, long, and hard work necessary to win, and win big.

Statutory fee-shifting exists to encourage practitioners to do the same quality of work for those who cannot afford fees as they would for fee-paying clients—and to safeguard the protection of precious constitutional rights in the process. Those who undertake federal fee-shifting work must be permitted to earn fees comparable to those highly skilled practitioners could earn in other similarly complex fields such as anti-trust, complex business litigation, ERISA, etc.—or top-quality lawyers will not have the appropriate incentives to roll the dice at the constitutional table. ⊙



*Subodh Chandra is managing partner of The Chandra Law Firm LLC, a civil rights litigation boutique in Cleveland, Ohio. Significant cases include successful voting rights litigation on behalf of a homeless coalition against Ohio's Secretary of State, and a multi-million-dollar jury verdict in a First Amendment employment retaliation case. Chandra is a former director of law and prosecuting attorney of the City of Cleveland, a former assistant U.S. attorney, and a refugee of large firms in Los Angeles and Cleveland. Chandra is a graduate of the Yale Law School and Stanford University. © 2013 Subodh Chandra. All rights reserved. For reprint permission, contact Subodh.Chandra@ ChandraLaw.com*

### Response by Liza Franklin

We are not actually arguing about different things. You wax poetic about the difficulties of litigation. I agree. You talk about how hard prosecuting a case is. I agree. You do not, however, talk about the responsibilities you have to anyone other than the client and your partners. I suggest there are more responsibilities at work here than simply those to this particular client. Lawyers who sue municipalities should recognize that the money does not come from the tree growing on the roof of City Hall. It is not an amorphous, mysterious, magically renewing bag of money. These are tax dollars from real people, used to do real things in society. Lawyers who sue municipalities should take those responsibilities as seriously as do the attorneys who take the pay cuts to work for those municipalities.

I am suggesting that the proper approach for a "private attorney general" is to act as though you have a paying client. Take a look at the cases from the perspective of a lawyer representing a paying client. A paying client would not pay for the overbilling of a case. My division sometimes hires outside counsel to represent Chicago police officers in civil rights cases. In my capacity as deputy corporation counsel, I am the general counsel who reviews those bills. I reject charges when a partner bills 6 hours to redact documents or make photocopies. The taxpayers do not pay for food for in-house attorneys, and they do not pay for food for outside counsel who work past 7:00 p.m. Our outside counsel know that the bills are reviewed, and they take their billing responsibilities to the taxpayers seriously. Those that have failed to do so no longer work for the taxpayers. As the loser in a case, we cannot force you to be reasonable. But we hope you will. And buy your own M and Ms. ⊙

---

**DEFENSE** continued from page 51

brief in response to the fee petition (or by the court's decision) in that case has learned a lesson and will scrutinize the billing invoice more closely before submitting it for payment.

But as to many of the other litigation expenses that she lists, I do not find them unreasonable or worthy of mockery on their face without further inquiry. Transporting the trial exhibits in a van? Perhaps they were large exhibits and it was necessary and reasonable. Cab rides? Perhaps they were reasonable—it's either that or pay huge parking fees and/or rental-car expenses in a big city. A hotel room in downtown Chicago to avoid commuting to the suburbs in the midst of trial (and presumably to use as joint work space for continued trial preparation)? Potentially reasonable if you have ever contended with Chicago commuter traffic, need to be certain that you arrive in court on time, and need to maximize your trial-preparation time. And keep in mind, these were all presumably documented expenses that plaintiffs' counsel advanced and bore, not knowing whether they would win. They might very well have had to eat them—personally. They should not if their clients prevail.

As much as defense counsel (and sometimes courts) often sneer in their fee briefs at the time and expenses the plaintiffs' lawyers invest in their cases, the truth is that all lawyers have to exercise professional judgment about what it takes to work efficiently and win. Having been on both the defense and plaintiff's end of the bar (and as someone who now does both, although mostly the latter), I can state unequivocally that it is generally easier to be a defense lawyer than to be a plaintiff's lawyer. The plaintiff's lawyer bears the burden, often weighty in civil rights cases, of proving the case. The plaintiff's lawyer generally does not get paid at all, or reimbursed for out of pocket costs, unless the client prevails. The defense lawyer merely needs to find chinks in the armor of the case—some that are technical, procedural, or simply contrived, and that have little to do with rendering justice. Obviously, I am oversimplifying, but the underlying point is that it easier to be an armchair critic and complain that someone else didn't *really* have to invest time or money in a case to win than to actually do it.

And of course, that is exactly what happens. From the moment a fee motion is filed, plaintiffs' lawyers find themselves subject to virtually proctological post-hoc second-guessing (often through discovery that intrudes into work product and even other, unrelated client matters).

Courts sometimes forget that in fee-shifting cases, the awarding of fees is not meant to be an act of grace. It is a legal entitlement for the clients based upon the considered policy judgment of Congress that our Constitution is worth fighting for, and that we need lawyers willing to take up the cause. I would urge courts to avoid being drawn in to the game of second-guessing the professional judgment and integrity of those who appear before them. If an attorney is foolish enough to attempt to bill for a $3 Snickers bar, then, by all means, strike it. And administer a verbal spanking. But ask also why defense lawyers are nickel and diming the bill, and running the bill up further by doing so, when it is their client who violated the Constitution. ⊙

**Endnotes to Both Perspectives** listed on page 57

**Endnotes to Both Perspectives**

[1]Fed. R. Civ. P. 54(d)(1).

[2]*Cf. Yahoo!, Inc. v. Net Games, Inc.*, 329 F. Supp. 2d 1179, 1183 (N.D. Cal. 2004) (stating that fee-shifting is intended to allow plaintiffs to obtain only "reasonably competent counsel," not "counsel of unusual skill and experience" and limiting local hourly rate).

[3]*Nat'l Ass'n of Concerned Veterans v. Sec'y of Defense*, 675 F.2d 1319, 1335 (D.C. Cir. 1982) (considering work "expended outside the four corners of the litigation"); *see also Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 767 (7th Cir. 1982) (in Title VII action, permitting fees for collateral federal-contract debarment action, where efforts "were designed to [and did] move the Title VII case toward ultimate disposition", and so "in that sense [were] within the Title VII action").

[4]*Concerned Veterans*, 675 F.2d at 1335.

[5]*Arizona v. Maricopa County Medical Soc'y et al.*, 578 F. Supp. 1262, 1268 (D. Ariz. 1984) (quoting *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1313 (9th Cir.), *cert. denied,* 459 U.S. 1009 (1982). *See also Boehner v. McDermott*, 541 F. Supp. 2d 310, 319 (D.D.C. 2008).

[6]532 U.S. 598 (2001).

[7]*See, e.g., Johnson v. Mississippi*, 606 F.2d 635, 637 (5th Cir. 1979) (holding that it is not a "special circumstance" justifying a lack of a fee award that taxpayers will be footing the bill).

[8]*See generally City of Riverside v. Rivera*, 477 U.S. 561 (1986).

[9]*See, e.g., Nadarajah v. Holder*, 569 F.3d 906, 922 (9th Cir. 2009) ("[b]y and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker") (quoting *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008)); *see also Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992) (deeming inappropriate an "ex post facto determination of whether attorney hours were necessary to the relief obtained").

[10]106 S. Ct. 2686, 2696 (1986).

[11]*Id*.

[12]*Fox v. Vice*, 131 S. Ct. 2205, 2213 (2011) (citing *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S. Ct. 964, 19 L.Ed.2d 1263 (1968) *(per curiam)*).

[13]*Hensley v. Eckerhart*, 461 U.S. 424, 434 103 S. Ct. 1933, 1939-1940 (1983).